UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Justin Reid,

       Plaintiff,

v.                                                          Case No. 18-13681

City of Detroit, *et al.*,                                  Sean F. Cox
                                                            United States District Court Judge

       Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this civil action, Plaintiff Justin Reid asserts §1983 claims against the City of Detroit

and five of its current or former police officers, alleging that the officers violated his Fourth

Amendment rights during the execution of a search warrant at his business premises.  He also

asserts a *Monell* claim against the City, seeking to hold it liable for those violations.

Two motions seeking a default judgment against Defendant Arthur Leavells were denied

in prior opinion and orders.  The matter is now before the Court on a summary judgment filed by

the remaining Defendants.  After this motion was fully briefed, this Court heard oral argument

on October 8, 2020.  The Court later ordered supplemental briefs.

For the reasons that follow, the Court shall grant the motion in part and deny it in part.

The Court shall grant the motion to the extent that it concludes that Defendants Geelhood,

Tourville, Riley, and Bray are entitled to qualified immunity with respect to all claims asserted

against them, with the exception of the Fourth Amendment excessive force claim asserted

against Defendant Bray.  The Court also concludes that the City is entitled to summary judgment

1

as to the *Monell* liability count against it.  Accordingly, the Fourth Amendment excessive force claim asserted against Defendant Bray alone shall proceed to a jury trial.

## BACKGROUND

Acting through counsel, Plaintiffs Justin Reid and Stephen McMullen filed this action on November 26, 2018.

Plaintiffs filed a First Amended Complaint on March 28, 2019.  (ECF No. 19).  That pleading alleges that the "Defendant-Officers" did various things during the execution of a search warrant in January of 2014, without specifying which officers did them.

Following a Motion to Dismiss, a Second Amended Complaint was filed on December 1, 2019.  (ECF No. 63).  At this juncture, the only Plaintiff is Justin Reid ("Reid").  This is Reid's third complaint in this case.

In it, Reid asserts claims against the City of Detroit ("the City") and five of its current or former police officers: 1) Sgt. Stephen Geelhood; 2) Gregory Tourville, 3) Steven Riley; 4) Matthew Bray; and 5) Arthur Leavells.  It includes two counts: 1) a count titled "Violation Of The Fourth Amendment" asserted against all of the individual Defendants; and 2) a count titled "*Monell* Claim Against City Of Detroit For Inadequate Training And/Or Supervision Of Its Agents And Employees Regarding The Constitutional Rights Of Citizens," asserted against the City.[1]

As to the factual allegations concerning the Fourth-Amendment claims asserted against the individual officers, Reid's Second Amended Complaint alleges as follows:

---

[1]Reid's Second Amended Complaint dropped a count that had been included in the First Amended Complaint, that alleged that Defendants deprived Plaintiffs of their lawful property without due process of law in violation of the Fourteenth Amendment.

9.  In January 2014, Plaintiff Justin Reid was the lawful and licensed operator of a marijuana grow/distribution facility named Organic Man Sam's Compassion Club ("OMS CC") located in the City of Detroit.

10. On or about January 6, 2014, Defendants, acting under color of law and as officers of Defendant City of Detroit's Narcotics Unit, conducted an unlawful raid of Plaintiff's aforementioned business.

11. During the raid, which was supervised by Defendant Sgt. Geelhood, Defendants extensively tore apart Plaintiff's property and removed, without lawful authority, marijuana and other related products of Plaintiff's business.

12. Defendant-Officers purposefully concealed their identities during the raid as many of them wore face masks.

13. During the raid, Plaintiff Reid was unlawfully searched and seized(handcuffed) within the meaning of the Fourth Amendment.

14. Defendants seized without lawful authority approximately $35,000-$50,000 cash from Plaintiff's business.  In their evidence logs and police reports, however, Defendant Riley reported seizing only $6,597.00.

15. Upon information and belief, Defendant Tourville forged Plaintiff Reid's signature on a form entitled "Notice of Seizure and Intent to Forfeit" which was witnessed by Defendant Sgt. Geelhood.

16. Defendants also seized, without lawful authority, several pounds of lawfully possessed marijuana though Defendants underreported the amount they seized.

17. Defendants also took, without lawful authority, a lawfully possessed handgun belonging to Plaintiff Reid.

18. Defendants had no probable cause to seize and/or arrest Plaintiff Reid nor was Plaintiff Reid ever shown a search or arrest warrant at the time of the raid.

19. Defendant Bray forced, coerced, and/or threatened Plaintiff Reid at gun point to sign a false confession.

20. Plaintiff recently obtained an affidavit in support of a search warrant for their premises (though Plaintiff was never shown a copy of same) that was

signed by Defendant Arthur Leavells who was criminally indicted. Leavells pled guilty for his role in a conspiracy that included unlawfully searching and seizing legitimately operated marijuana grow and distribution facilities in and around the City of Detroit.

21.     Defendant Leavells falsely testified to facts in the affidavit in support of the search warrant of Plaintiff's business.  In particular, Defendant Leavells provided false testimony regarding information he alleges he received from a source of information ("SOI 2499") and otherwise fabricated the bases of probable cause by falsely testifying as to a controlled buy between SOI 2499 and a "seller" at Plaintiff's premises.

22.     Plaintiff was   never charged with any crimes related to the raid upon his business.

23.     Defendants Bray, Tourville, Riley, and Leavells assisted and actively participated in the unlawful raid described herein under the supervision of Defendant Geelhood.

24.     Upon information and belief, Defendants have engaged in similar unlawful searches and seizures of other legitimate marijuana grow and/or distribution facilities in and around the City of Detroit.

25.     Defendant City of Detroit has allowed an unconstitutional policy, custom and practice to flourish within its police department under which its police officers, including Defendants, have unlawfully seized, confiscated, destroyed, or otherwise disposed of legitimate products of marijuana grow facilities.

26.     During these unconstitutional searches and seizures, Plaintiff and dozens of other similar business owners would be threatened, intimidated, detained, and seized (often at gun point) without probable cause.

27.     Upon information and belief, Defendants, including its supervisory personnel like Defendant Sgt. Geelhood, routinely conducted, participated, encouraged and/or allowed the types of illegal searches and seizures described herein.

28.     As a result of Defendants' actions, Plaintiff was  degraded, humiliated, and subjected to an unlawful search and seizure in violation of his constitutional rights.

29.     Plaintiff suffered extreme emotional distress, humiliation, embarrassment, and damage as a result of Defendants' unlawful actions.

4

(Sec. Am. Compl. at 2-6).  The actual count alleges as follows:

COUNT I; VIOLATION OF THE FOURTH AMENDMENT

32.  Plaintiff hereby incorporates by reference herein the allegations contained in the above Paragraphs of the Complaint.

33.  The acts of Defendants as ratified, endorsed, and cultivated by the City of Detroit and its Police Department as described herein violated Plaintiff's rights against unlawful and unreasonable search and seizure as guaranteed by the Fourth Amendment to the United States Constitution.

34.  Plaintiff Reid's search and seizure as described herein was undertaken by Defendants without probable cause and without regard to any legitimate law enforcement interest.

35.  Defendants' actions were not taken spontaneously in response to an emergency, but rather in conformity with Defendant City's deliberate policies, customs, and practices as carried out through the Detroit Police Department.

36.  The constitutional rights that Defendants violated were clearly established at all times when Defendants violated such rights and a reasonable person in Defendants' position would have understood that their conduct was in violation of those rights.

37.  Defendants are not entitled to qualified immunity.

38.  By virtue of Defendants' actions, Plaintiff is entitled to compensatory, exemplary, and punitive damages.

(*Id*. at 6-7).

Discovery has closed and the deadline for filing motions was June 15, 2020.  (*See* June 4, 2020 Docket Entry).

The City of Detroit declined to defend or indemnify Defendant Arthur Leavells, one of the five Defendant police officers in this case.  The City does not represent Leavells and he has not entered an appearance or defended in this case.  Reid filed a "Motion for Default Judgment As To Liability Against Defendant" Leavells, wherein Reid asked this Court to enter a default

judgment as to liability only as to Leavells. This Court denied that motion and also denied a motion seeking reconsideration of that ruling. Reid later filed a second motion seeking a default judgment against Leavells, that was also denied by this Court.

The matter is now before the Court on a summary judgment motion filed by the remaining Defendants.

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

The parties complied with the Court's practice guidelines for summary judgment motions such that Defendants' motion includes a "Statement of Material Facts Not In Dispute" ("Defs.' "Stmt.") and Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Pl.'s Stmt.").

The relevant evidence submitted by the parties is set forth below. Unless stated otherwise, these facts are undisputed for purposes of the pending summary judgment motion.

This § 1983 action involves the execution of a search warrant by Detroit Police officers on a business called Organic Man Sam's Compassion Club ("OMS"), which was a marijuana dispensary located in the City of Detroit. (Defs.' & Pl.'s Stmts. at ¶ 1).

On January 8, 2014, officers from the Detroit Police Department executed a judicially-authorized search warrant on OMS between 2:15 and 3:00 p.m. (*Id.* at 10).

Defendant Leavells was the affiant for the search warrant. He established probable cause through a controlled buy of marijuana. (Defs.' & Pl.'s Stmts. at 11). At this time, in 2014, operating a marijuana dispensary was illegal under federal and state law. *B.R.-S.O.H LLC v. City of Detroit,* 2019 WL 2949501 at * 2 (E.D. Mich. 2019) (noting that prior to the enactment of the Medical Marijuana Facilities Licensing Act ("MMFLA"), "all medical marijuana dispensaries were illegal under Michigan law.").

Sgt. Geelhood and Officers Tourville, Riley, and Bray assisted with the execution of the search warrant. (Defs.' Stmt. & Pl.'s Smt. at ¶ 15). It is undisputed that those four officers played no role in establishing probable cause, swearing out the affidavit, or securing the search warrant. (*Id.* at ¶ 16).

The search warrant (ECF No. 93-4) authorized the seizure of, among other things, all suspected controlled substances, money, narcotics paraphernalia, and firearms. (*Id.*).

The Return to Search Warrant Form states that the following was seized during the search: 1) a total of $7,437.00 in United States currency; 2) 10 marijuana plants; 3) two large ziploc bags of marijuana weighing 3,120.7 grams; and 3) one firearm containing five live rounds. (ECF No. 93-6).

The Notice of Seizure And Intent To Forfeit form completed as to $840.00 in United

States currency from Mark Coakley states "Refused" in the section of the form for his signature. (ECF No. 99-2).

The Notice of Seizure And Intent To Forfeit form completed as to the $6,597.00 seized from Reid contains similar, but illegible signatures in the lines on the form for both Reid's signature and for Officer Tourville's signature. (ECF No. 99-2 at PageID.2785). That same form indicates it was witnessed by Sgt. Geelhood.

During discovery, Reid testified that a friend of his named Mark Coakley was there when the search occurred. (Reid Dep. at 30). After officers entered the premises, Reid states that a female officer handcuffed him and Coakley and took them to the front of the building. (*Id*. at 33). Reid testified that after being asked where the product was, Reid told them there was a safe upstairs. Reid testified that there was marijuana and money in the safe. (*Id*. at 39).

**Under-Reporting Money And Drugs Seized**

Reid initially testified that he believed there was between $35,000 and $50,000 in the safe and that it was proceeds from the sale of marijuana through the business. Reid testified that some of the money in the safe was his but half of it belonged to non-party McMullen. (Reid Dep. at 56). Reid testified that the money was "wrapped in daily sheets" and dropped in the safe and that he "didn't go through and count it on a regular basis." (*Id*.).

Reid testified that he believed there was 15 to 18 pounds of marijuana at the premises. (*Id*. at 57).

Reid later testified as follows regarding the amount of cash and marijuana that was seized during the execution of the search warrant:

Q. So you know, at the time this happened, that police officers took 15 to 18 pounds of marijuana from OMS, correct?

8

A.      Yes.  I knew that they cleared out our whole inventory.

Q.      And you knew that they took between 50 – or 35 to $50,000.

A.      Yes.

Q.      All right.

A.      And I – and I'm more confident that we're in the $30,000 range because the paperwork that I seen that they said I signed, I did not sign it, and I remember seeing somewhere in the range of 30,000 on the paper and telling them, you know, I'm not signing any paperwork right now.

Q.      You saw $30,000 in the paperwork?

A.      In the range of 30.  It was a 30.  It could have been 6, if could have been 4, it could have been 5.  I'm not sure.  That's why I say 30 to $50,000 total.  Because they wrote on that paperwork that they had seized about 30-something thousand dollars.

Q.      They actually wrote that they received $6,000.

A.      And they forged my signature.

Q.      So what you said is they wrote –

A.      On the original paperwork that I seen that day, they were claiming that they had 30 – in th range of $30,000 –
                    MR. DETTMER: 30-plus.

BY MR. SUROWIEC:

Q.      All right.  So at that time, you knew that police took $30,000 from you.
                    MR. DETTMER: Plus.

A.      30,000-plus, yes.

(Reid Dep. at 62-63).

**Testimony Regarding Notice Of Forfeiture**

Reid testified that he did not read the notice of forfeiture that the officers wanted him to

sign and that he refused to sign it, telling them "I'm not signing it.  Take it.  It's yours."  (Reid

Dep. at 67).

During his deposition, Tourville testified as follows regarding the signatures on the

forfeiture form relating to the currency seized from Reid:

THE WITNESS: In review of this document, from top to bottom, I filled out this document.  The only part that I did not fill out was Sergeant Geelhood's signature.

It appears, in review of this document, that I may have inadvertently signed my name initially in the spot of Justin Reid, and then re-signed my name on the bottom line when it became aware to me that my signature was not on the

form.

BY MR. SUROWIEC:

Q.     So it's possible that was done by you?

A.     Yes.

Q.     And it would have been an error?

A.     Yes.

Q.     Go – looking back at that record, if you would, look at Bates number 19, the next page.

A.     Yes.

Q.     Do you see that?  That's a Notice of Seizure and Intent to Forfeit form that is signed by Marc Coakley – or I am sorry.  That's for Marc Coakley, and $840 was taken from him, correct?

A.     Yes.

Q.     What does it say next to his signature?

A.     Refused.

Q.     How long have you been a police officer?

A.     Twenty years.

Q.     Have you turned in Notice of Forfeiture documents in your practice as a police officer?

A.     Yes.

Q.     Are there times where people are willing to sign them? Are there times where people are willing to sign their name?

A.     Yes.

Q.     Are there times where people are not willing to sign their name?

A.     Yes.

Q.     What do you do when they don't want to sign their name?

A.     We write refused.

Q.     Does it matter one way or another to you if the person writes refused or if they sign their name?

A.     No.

Q.     Why not?

A.     Most people do not sign their to the  – I think we – I think I personally encounter more refusals.  A lot of people don't really understand what the document they are signing is.  I have never had – a document that has been a refusal written, I've never had that affect any hearing that I've been to.  It doesn't affect anything.  They just are opting not to sign, and we just write refusal there.

(Tourville Dep. at 96-98).

**Testimony Regarding Alleged Excessive Force By Bray**

The police reports submitted by the parties include a statement signed by Reid on the

date of the search. (*See* ECF No. 93-6 at PageID.2470-71). In that statement, Reid stated that he possessed and was growing the marijuana at the premises, that he intended to sell it, and that he knew he was breaking the law by engaging in that activity.

During his deposition in this case, Reid testified as follows regarding the circumstances surrounding that statement being taken by Officer Bray:

A.    Can I explain how this was done?

Q.    Please do.

A.    I was brought into the office. I was handcuffed. I was sat down. He sat down in my chair, pulled his gun out, put it on the table it, pointed it at me and said, this is how it's going to work. I'm going to ask you questions. I'm going to nod or I'm going to shake my head. You're going to say the verbal answer to these questions and then you're going to initial them saying that you've done these on your own free will.

Q.    Okay.

A.    And I said, sounds like a plan, man. I'm handcuffed with a pistol to me.

Q.    All right. So he said he's going to ask you the questions and you're going to give the responses.

A.    He's going to ask me the questions, he's going to shake his head yes or no, and I'm going to answer the question how he is shaking his head.

Q,    All right. So you – now you are – what you're saying is – if I understand you correctly – he not only forced you to sign this confession, but he made it up. He made you write the answers based on his --
      MR. DETTMER: He gave you the answers.

A.    He gave me the answers and wanted me to initial next to the answers to show that I did it on my own free will.

BY MR. SUROWIEC:

Q.    All right. And then you signed that at the bottom. That's your signature on the bottom?

A.    Yes.

Q.    All right. Now, I ask you this because – why would you do that?

A.    Why would I do what?

.    Q.    Well, why would you sign a confession that wasn't yours?

A.    Like I said, there was a pistol on me and I was handcuffed.

. . . .

Q.    He slapped the pistol down. It was on the table.

A.    He was intimidating. He was making an intimidating gesture with his gun to make sure that I understood that this is how it works.

Q.    You were in handcuffs, right?

A.    In handcuffs.

11

Q.     And he put the gun down on the table.

A.     Yes.

Q.     He was not holding the gun in his hand while you were answering the questions.

A.     No.

Q.     All right.  He was not pointing it at your head while you were answering questions.

A.     I'm in handcuffs, he's not.  It's still an intimidating situation.

Q.     I understand.

A.     Okay.

Q.     But he didn't hold it to your head, like in a hostage situation, and saying answer the questions.

A.     No.

Q.     He didn't pick it up and point it to you the whole time at your face?

A.     Not the whole time. It was [sic]

Q.     I'm talking about the Q and A.

A.     No, no.  He wasn't pointing the gun at me saying, answer these questions, at gun point. It was presumed that I am going to listen to how everything is going to work and the pistol is an intimidation factor of, this is how it works.

(Reid Dep. at 68-71).

**Status Of Currency, Gun, And Marijuana Logged Into Evidence**

It is undisputed that Reid did not seek the return of the currency, gun, or marijuana that the officers seized and logged into evidence.

Defendants submitted evidence indicating that the marijuana logged into evidence was destroyed, the gun is still in the possession of the police department, and the $6,597.00 in currency was administratively forfeited on April 12, 2014.  (ECF Nos. 93-14 & 93-15).

**STANDARD OF DECISION**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving

12

party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" for the purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover, Co.* 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## ANALYSIS

### I.    Are Defendants Geelhood, Tourville, Riley, and Bray Entitled To Qualified Immunity?

The four individual Defendants at issue in this motion assert that they are entitled to qualified immunity as to Plaintiff's claim that they violated his Fourth Amendment rights in violation of § 1983.

To state a claim under § 1983, a plaintiff must set forth facts that, when construed favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the

13

plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994). Here, Defendants have raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

There are four individual Defendants at issue in this motion (Geelhood, Tourville, Riley, and Bray). "Each defendant's liability must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

It is well established that "damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did that violated the asserted constitutional right." *Lanman,* 529 F.3d at 684; *Terrance,* 286 F.3d at 842. (The Sixth Circuit "has consistently held that damage claims against governmental officials alleged to arise from violation of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right.") (emphasis in original).

The first step in the qualified immunity analysis is to consider whether, viewing the facts

14

in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with respect to any of these officers.  Then, the Court considers if that right was clearly established.

To do this, the Court must first identify the claims that Reid has asserted against these individual Defendants.  Reid's Second Amended Complaint includes just one count – "Violation of the Fourth Amendment."  But the body of Reid's Second Amended Complaint includes a variety of factual allegations.

Given the nature of Plaintiff's Second Amended Complaint, Defense Counsel's summary judgment motion addresses what they believe are the claims Plaintiff is asserting against them. In response, Plaintiff appears to abandon some of those claims but adds another one, based on an alleged failure to knock and announce.

### A.    Procuring The Search Warrant And General Execution Of Search Warrant

It is undisputed that on January 8, 2014, the Defendant Officers executed a facially-valid, judicially-authorized, search warrant on the premises.  (Defs.' & Pl.'s Stmts. at ¶ 10; 10/8/20 Hrg. Tr.).  It is also undisputed that Defendant Leavells was the affiant for the search warrant obtained for the premises and that he established probable cause through a controlled buy set forth in his affidavit.  (Defs.' & Pl.'s Stmts. at ¶ 11).

In the Second Amended Complaint, Plaintiff alleges that Leavells violated his Fourth Amendment rights by falsely swearing to the facts set forth in his affidavit.  Reid does not allege that any of the other officers assisting Leavells in obtaining the search warrant or that any of the other officers knew that Leavells had falsely sworn to the facts set forth in his affidavit.

Defendants take the position that, to the extent that Plaintiff is attempting to pursue a claim against these four officers for obtaining the search warrant, that claim fails.  Defendants

assert that there are no allegations, or any evidence, that Geelhood, Tourville, Riley or Bray "participated in or assisted Leavells in procuring the search warrant or in establishing probable cause." (Defs.' Br. at 13-14). Defendants have also testified that they did not participate in drafting the search warrant or affidavit.

Defendants further contend that, to the extent that Plaintiff is seeking to pursue a claim that these officers violated his constitutional rights by simply assisting with the execution of the search warrant, such a claim would fail because those officers are entitled to rely on an judicially-authorized, facially-valid search warrant. *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005) ("In § 1983 actions, an officer ordinarily received qualified immunity if he or she relies on a judicially secured warrant," so long as the warrant was not "so lacking in the indicia of probable cause" that reliance on the warrant would be unreasonable.).

In response, Plaintiff directs the Court to Sixth Circuit's decision in *McCallum v. Geelhood*, arguing:

> Defendants Geelhood, Tourville, Riley, and Bray argue they are entitled to qualified immunity because they merely assisted "with the execution of a facially valid . . . search warrant. In another case involving Defendant Geelhood the Sixth Circuit has held codefendant officers are not entitled to qualified immunity where there is a question of fact as to whether such codefendants acted with the requisite knowledge and intent to share liability for the execution of an invalid search warrant.
> In *McCallum v. Geelhood*, 742 Fed. Appx. 985 (6th Cir. 2018), the court denied qualified immunity to both Defendants Geelhood and Matelic based on evidence that Matelic falsified a narcotics-related affidavit (at the direction of Geelhood). The district court denied both Geelhood's and Matelic's qualified immunity defense finding that, although Matelic was the affiant, there was a question of fact as to whether Geelhood "acted with the requisite knowledge and intent to share liability for the execution of the invalid search warrant." *McCallum*, 742 Fed. Appx. at 989) (affirming district court's denial of qualified immunity as to both Geelhood and Matelic. The same holds true here.

(Pl.'s Br. at 3-4). Plaintiff's brief then directs the Court to testimony given by Leavells in a

criminal case, wherein he testified that other officers were "dirty cops," but none of that testimony pertains to this case or the search warrant obtained in this case.

The facts in *McCallum* can readily be distinguished from those in this case. In *McCallum*, a search warrant was obtained and executed at the plaintiff's property. The plaintiff filed a § 1983 action alleging, among other things, that Officer Matelic submitted an affidavit in support of the search warrant that contained false and misleading statements, and that Matelic made those statements deliberately or with reckless disregard for the truth. Notably, Matelic admitted "that she never actually received information from the informant described in her affidavit and never even knew the informant's identity." *Id*. at 987. Matelic stated that Officer "Geelhood provided her with all of the information related to the confidential informant." *Id.* The district court denied qualified immunity to both Matelic and Geelhood, and found that the following disputed issue would proceed to trial: "Whether Geelhood, in his review of Matelic's submission of the search warrant affidavit, acted with the requisite knowledge and intent to share liability for the execution of the invalid search warrant." *Id*. at 989. The Sixth Circuit affirmed the district court's denial of qualified immunity.

Unlike the situation presented in *McCallum*, the only allegation, and the only evidence presented to the Court, is that Leavells alone obtained the search warrant at issue in this case and that he drafted and signed the supporting search warrant affidavit. Plaintiff has not presented any evidence that could create a genuine issue of fact as to whether any of these four officers (Geelhood, Tourville, Bray, or Riley) had any involvement in procuring the search warrant.

As such, construing the evidence in a light most favorable to Reid, he has not established a constitutional violation by any of these four officers with respect to procuring the search

warrant or generally assisting with the execution of the facially-valid, judicially-authorized search warrant.

### B.     Wrongful Arrest Of Reid

Next, Defendants assert that if Reid is alleging that he was falsely arrested, that claim would fail under Fed. R. Civ. P. 56(c).  (Defs.' Br. at 14).  In support of this argument, Defendants assert:

> "A [federal] false arrest claim . . . requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005)). The Sixth Circuit holds that probable cause exists when a police officer "discovers reasonably reliable information that the suspect has committed a crime." *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).
>       Reid admitted that he was running an illegal marijuana grow/distribution facility in the City of Detroit in violation of state and federal law. (Ex. 2, ¶ 9)  He knew what he was doing violated federal law. (Ex. 1, pp. 87-88)  He claims he had between 15 to 18 pounds of marijuana at the location, a firearm, and between $35,000 to $50,000 in proceeds from the business. (Ex. 1, p. 52, lines 1-16, p. 57, lines 13-15, p. 64 lines 3-5, p. 67, lines 23-24). Because the officers had actual knowledge that Reid had committed multiple felonies in their presence, probable cause existed to arrest him.  To the extent there is a false arrest claim, Defendants are protected by qualified immunity. *Harlow*, 457 U.S. 818.

(*Id*. at 14-15).

In response, Plaintiff does not dispute that the officers found probable cause to arrest him during the execution of the search warrant.  Rather, Plaintiff challenges the validity of the underlying search warrant based on Leavells' alleged conduct.  (Pl.'s Br. at 8) ("In this case, it is established (by default against Leavells) that the affidavit was falsified and that there was no probable cause for the search.").

Again, it is undisputed that there was a judicially-authorized search warrant.  These

18

officers played no role in obtaining it.  Rather, they merely executed it.  As such, they did not violate Plaintiff's constitutional rights when, during the execution of that judicially-authorized and facially-valid search warrant, they found probable cause to arrest Reid and did so.

### C.   Under-Reporting Amount Of Cash Seized From Plaintiff And Forging Reid's Signature On Forfeiture Form.

Plaintiff's brief asserts that there is a "fact question as to whether Defendants Tourville and Geelhood underreported the amount of cash seized from Plaintiff's business and then forged Plaintiff's signature on the 'Acknowledgements' section of the Notice of Seizure and Intent to Forfeit Form." (Pl.'s Br. at 5).  In the Second Amended Complaint, Reid alleges that approximately $35,000 to $50,000 in cash was seized from his business during the search but that "Defendant Riley reported seizing only $6,597.00." (Sec. Am. Compl. at ¶ 14).

#### 1.   Alleged Forgery

In his Second Amended Complaint, Reid alleges "[u]pon information and belief, Defendant Tourville forged Plaintiff Reid's signature on a form entitled, 'Notice of Seizure and Intent to Forfeit' which was witnessed by Defendant Sgt. Geelhood." (Sec. Am. Compl. at ¶ 15).

Defendants' motion asserts that Reid has failed to establish an actionable constitutional claim as to this alleged conduct. (Defs.' at 15-16).  Defendants contend this alleged conduct does not create an actionable claim under § 1983.  (Defs.' Br. at 17-18).  They assert that is "especially true when Tourville admitted that he mistakenly signed on the wrong line and where Reid knowing waived his right to the property seized by failing to request a hearing." (*Id*. at 15).

At the October 8, 2020 hearing, Plaintiff's counsel clarified for the Court that Reid *is not* asserting a claim based upon the alleged forgery on the form. (*See* 10/8/20 Hrg. Tr.).

#### 2.   Under-Reporting Cash

19

In his Second Amended Complaint, Reid alleges as follows in paragraph fourteen::

14.     Defendants seized without lawful authority approximately $35,000-
        $50,000 cash from Plaintiff's business.  In their evidence logs and police
        reports, however, Defendant Riley reported seizing only $6,597.00.

(Sec. Am. Compl. at ¶ 14).

To the extent that Plaintiff claims the officers seized cash from the premises when the seizure of cash *was not authorized* ("seized without lawful authority"), that claim fails because the facially-valid, judicially-authorized search warrant expressly authorized the seizure of cash. (*See* Search Warrant, ECF No. 93-4 at PageID.2456).

To the extent that Reid is attempting to assert a claim based on a later *failure to return seized currency to him*, he has no actionable claim in this case.  A claim that challenges the initial seizure of property is brought under the Fourth Amendment.  But once the "act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." *Fox v. Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999).  A claim for an illegal refusal to return seized property would be a procedural due process claim brought under the Fourteenth Amendment.  Reid asserted such a claim in his First Amended Complaint (*see* Count II of First Amended Complaint "Violation of the Fourteenth Amendment", ECF No. 19 at PageID.226). Notably, however, Reid dropped that count when he filed his Second Amended Complaint, as his counsel conceded at the hearing.

That leaves Reid's claim that Defendant "Riley reported seizing only $6,697.00" in currency although unidentified officers actually seized between thirty-five and fifty thousand dollars. Taken as *actually alleged*, Reid claims that Riley incorrectly recorded the amount of the currency that was seized during the execution of the search warrant.  Reid does not allege that

Riley knew that more than the amount he recorded was actually seized or that the error was intentional. It is far from clear that this conduct, as actually alleged, amounts to a constitutional violation or, if it does, that such a right was "clearly established" at the time of the search.[2]

What Plaintiff's counsel may have *meant to allege* is that the officers seized and recorded one amount of currency and then also stole another quantity of currency that they did not include in their reports or log into evidence. For reasons unknown, despite having drafted and filed *three different complaints* in this case, Reid's counsel never alleged that any of the officers stole money or drugs from him during the search.[3]

### D. Bray's Alleged Conduct In Securing Confession From Reid

In his Second Amended Complaint, Reid alleges that "Defendant Bray forced, coerced, and/or threatened Plaintiff Reid at gun point to sign a false confession." (Sec. Am. Compl. at ¶ 19). Reid acknowledges that he was never charged with any crimes relating to the search. (*Id*. at ¶22).

In his response brief, Reid asserts that "Officer Bray pointed his weapon at Plaintiff while he was handcuffed and while interrogating" Reid. (ECF No. 97 at PageID.2724). Reid directs the Court to his following deposition testimony:

---

[2]At the hearing, Plaintiff's counsel identified *McCallum v. Geelhood, supra*, and *Ingram v. City of Columbus*, 185 F.3d 579 (6th Cir. 2018) as the legal authority to establish that this specific conduct by Riley violated his Fourth Amendment rights. Neither of those cases, however, support that this alleged conduct amounts to a constitutional violation.

[3]During the summary judgment hearing, this Court addressed with counsel that the Second Amended Complaint does not allege that the officers stole money, drugs, or anything else during the execution of the search warrant. Plaintiff's counsel responded that paragraph fourteen of the Second Amended Complaint *infers* that the officers must have stolen cash from Plaintiff during the search. (10/8/20 Hrg. Tr.).

A.    Can I explain how this was done?

Q.    Please do.

A.    I was brought into the office. I was handcuffed. I was sat down.  He sat down in my chair, pulled his gun out, put it on the table it, pointed it at me and said, this is how it's going to work.  I'm going to ask you questions. I'm going to nod or I'm going to shake my head.  You're going to say the verbal answer to these questions and then you're going to initial them saying that you've done these on your own free will.

Q.    Okay.

A.    And I said, sounds like a plan, man.  I'm handcuffed with a pistol to me.

Q.    All right.  So he said he's going to ask you the questions and you're going to give the responses.

A.    He's going to ask me the questions, he's going to shake his head yes or no, and I'm going to answer the question how he is shaking his head.

Q,    All right.  So you – now you are – what you're saying is – if I understand you correctly – he not only forced you to sign this confession, but he made it up.  He made you write the answers based on his --
        MR. DETTMER: He gave you the answers.

A.    He gave me the answers and wanted me to initial next to the answers to show that I did it on my own free will.

BY MR. SUROWIEC:

Q.    All right.  And then you signed that at the bottom.  That's your signature on the bottom?

A.    Yes.

Q.    All right.  Now, I ask you this because – why would you do that?

A.    Why would I do what?

Q.    Well, why would you sign a confession that wasn't yours?

A.    Like I said, there was a pistol on me and I was handcuffed.

(Reid Dep. at 68-70).  Reid contends that this alleged conduct by Bray violated his Fourth

Amendment rights.

In challenging this claim, Defendant Bray contends that he is entitled to qualified

immunity because he has not violated any clearly established constitutional right.

First, Bray asserts that during Reid's deposition "Reid admitted that Bray did <u>not</u> point

the gun at him or hold a gun against his head as he signed the confession."  (Defs.' Br. at 17)

(emphasis in original).  In making that argument, Defendant misconstrues Reid's testimony.

Second, Defendant Bray asserts that even if Bray's allegations were accepted as true, the

"law in the Sixth Circuit permits officers to detain individuals in handcuffs and display firearms where the officers have a justifiable fear of personal safety." (*Id.*). But Reid's testimony went beyond his just being in handcuffs and the display of a weapon.  Reid testified that, while he was seated *and in handcuffs*, Bray *took his weapon out, pointed it at him* and said "this is how its going to work.  I'm going to ask you questions. I'm going to nod or I'm going to shake my head. You're going to say the verbal answer to those questions and then you're going to initial them saying that you've done these on your own free will." (Reid Dep. at 68-69).

The Court concludes that, *viewing the evidence in the light most favorable to him,* Plaintiff could establish a Fourth Amendment violation[4] by Bray.  Pointing a gun at an individual under such circumstances can constitute excessive force under the Fourth Amendment.  *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (recognizing that pointing a gun at an individual can constitute excessive force under the Fourth Amendment); *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019) (Noting that an "officer's use of excessive force violates the Fourth Amendment" and concluding the defendant officer in that case "was unreasonable in pointing his gun at plaintiff's head and holding him at gunpoint for approximately two minutes*."); Wright* v. City of Euclid, 962 F.3d 852, 870 (6th Cir. 2012) (Brandishing a firearm without a justifiable fear of fleeing or dangerousness was unreasonable and could constitute excessive force in violation of Fourth Amendment rights.).  Accordingly, the Court concludes that Defendant Bray is not entitled to qualified immunity as to this claim.

---

[4]The "Fifth Amendment guarantees that no person shall be compelled to give evidence against himself, and so is violated whenever a truly coerced confession is introduced at trial . . ." *Kansas v. Ventris*, 556 U.S. 586, 590, 129 S.Ct. 1841, 173 L.Ed.2d 801 (2009).  But Reid has not asserted a claim in this action for a violation of his Fifth Amendment rights and, moreover, Reid was never charged with any crimes following the execution of the search warrant.

E.       Marijuana And Handgun

Reid's Second Amended Complaint includes allegations concerning the seizure of

marijuana and a handgun during the execution of the search warrant:

> 16.     Defendants also seized, without lawful authority, several pounds of
>         lawfully possessed marijuana though Defendants underreported the
>         amount they seized.
> 17.     Defendants also took, without lawful authority, a lawfully possessed
>         handgun belonging to Plaintiff Reid.

(Sec. Am. Compl. at ¶¶ 16-17).

To the extent that Reid claims that any of the officers seized marijuana or the handgun

from the premises during the search *without lawful authority*, that claim would fail because the

judicially-authorized, facially-valid search warrant expressly authorized the seizure of firearms

and all suspected controlled substances.  (*See* Search Warrant, ECF No. 93-4 at PageID.2456).

To the extent that Reid is attempting to assert a claim based on a later *failure to return*

seized marijuana or the firearm to him, he has no actionable claim in this case.  A claim that

challenges the initial seizure of property is brought under the Fourth Amendment.  But once the

"act of taking the property is complete, the seizure has ended and the Fourth Amendment no

longer applies."  *Fox v. Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999).  A claim for an illegal

refusal to return seized property would be a procedural due process claim brought under the

Fourteenth Amendment.  Reid asserted such a claim in his First Amended Complaint (*see* Count

II of First Amended Complaint "Violation of the Fourteenth Amendment", ECF No. 19 at

PageID.226).  Notably, however, Reid dropped that count when he filed his Second Amended

Complaint.

That leaves Reid's claim that one or more unidentified officers "underreported" the

amount of marijuana they seized during the search in police reports or other records.  Taken as *actually alleged*, Reid claims that one or more officers incorrectly recorded the amount of the marijuana that was seized.  It is far from clear that conduct amounts to a constitutional violation or, if it does, that such a right was "clearly established" at the time of the search.

### F.     Failure To Knock And Announce

In response to Defendants' motion, Plaintiff now seeks to assert a new claim – that the officers violated his Fourth Amendment rights by failing to knock and announce their presence at the time of the execution of the search warrant.  (Pl.'s Br. at 7).  Plaintiff does not direct the Court to anywhere in his Second Amended Complaint where these allegations were made.

In their Reply Brief, Defendants state that no such claim was ever alleged in this case. "In his response brief, Reid claims for the first time 'that Defendants failed to knock and announce their presence at the time of the raid.'" (Defs.' Reply Br. at 2).  Defendants note that "[t]here are no allegations in the original complaint [DE 1] or the first amended complaint [DE 19] or the second amended complaint [DE 63] that the officers failed to knock and announce their presence" such that Defendants would have notice of this allegation.  (*Id.*).

It is well established that a plaintiff cannot assert a new claim for the first time in a summary judgment response, filed after the close of discovery.  *Naples v. Lowellville Police Dep't*, 125 F. App'x 636, 644 (6th Cir. 2005). (Affirming dismissal of claim where it "was never properly raised by plaintiff because he did not seek to amend the complaint and," instead, raised the "new claim for the first time in response to defendants' motions for summary judgment.").[5]

_____

[5]During a hearing on October 1, 2020, counsel for Plaintiff identified paragraph twelve of the Second Amended Complaint as one of the well-pleaded factual allegations specific to each of the four Defendant officers at issue in this motion.  Plaintiff's response to Defendants' summary

Accordingly, with the exception of the Fourth Amendment excessive-force claim asserted against Defendant Bray, the Court concludes that Defendants Geelhood, Tourville, Riley, and Bray are entitled to qualified immunity as to the claims asserted against them.

## II.    *Monell* Liability

Count II of Reid's Second Amended Complaint is titled "*Monell* Claim Against City Of Detroit For Inadequate Training And/Or Supervision Of Its Agents And Employees Regarding The Constitutional Rights Of Citizens."  This count seeks to hold the City liable for any constitutional violations committed by the individual officers named in this case.

Defendants' motion contends that the City is entitled to summary judgment as to the *Monell* claim for numerous reasons.

The City's first argument is that the "law is well settled that 'a municipality . . . cannot be liable under § 1983 absent an underlying constitutional violation by its officers.'  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986))."  (Defs.' Br. at 21).  In other words, the City argues that if no claims of a constitutional violation committed by an individual officer proceed to trial, then the City cannot be held liable and this count should be dismissed.

As explained above, however, the Court concludes that Defendant Bray is not entitled to qualified immunity with respect to the Fourth Amendment excessive force claim asserted against

_____

judgment motion, however, does not assert that Plaintiff has an actionable claim against any of the Defendants for the wearing of a  mask during the search.  As such, Plaintiff has provided no authority that would suggest that the wearing of a face mask during some portion of a search constitutes a Fourth Amendment violation especially where, as here, Plaintiff does not claim to be unable to determine the identity of any of the officers who took the various alleged actions.

him. Thus, there is a remaining claim against a City officer that will proceed to trial.

"A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Instead, a plaintiff must show that through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Griffith v. Franklin Cnty, Kentucky*, 975 F.3d 554, 581 (6th Cir. 2020). "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of [his or] her rights." *Id. "Montell* liability requires the plaintiff to 'identify the policy, connect the policy to the city itself and show that *the particular injury* was incurred because of the execution of that policy." *Hood v. City of Columbus, Ohio*, 827 F. App'x 464, 472 (6th Cir. 2020) (emphasis added).

Here, Reid must show that the City was the moving force behind the injury to have been caused by Bray's conduct in allegedly using excessive force.

"There are four methods of proving a municipality's illegal policy or custom. The plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Griffith, supra* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

In response to Defendants' summary judgment motion, Reid indicated that he had attempted to plead *Monell* liability under different theories. But now, at the summary judgment phase of this case, Reid states that he "intends to proceed on his *Monell* claim based on the

27

City's "custom of tolerance or acquiescence of federal rights violations." (Pl.'s Br. at 9). As such, the Court will consider whether Plaintiff can proceed with a *Monell* claim against the City based upon that theory.

As Plaintiff notes, that "inaction theory" of *Monell* liability requires: 1) the existence of a clear and persistent pattern of illegal conduct; 2) notice or constructive notice on the part of the defendant; 3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and 4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation. (Pl.'s Br. at 9); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

But Plaintiff's brief does not attempt to establish that the alleged excessive force committed by Defendant Bray can be attributed to the City via an inaction theory of *Monell* liability. Rather, Plaintiff's brief is devoted to attempting to show that he can proceed with a *Monell* claim against the City because the City knew or should have known about corruption and theft relating to the execution of search warrants. Plaintiff makes no reference to the City having actual or constructive notice as to excessive force being used by its officers. (*See* Pl.'s Br. at 9–25).

Accordingly, the Court concludes that the City is entitled to summary judgment as to Reid's *Monell* liability count.

## CONCLUSION & ORDER

The Court ORDERS that Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court rules

that  Defendants Geelhood, Tourville, Riley, and Bray are entitled to qualified immunity with respect to all claims asserted against them, with the exception of the Fourth Amendment excessive force claim asserted against Defendant Bray.  The Motion is also GRANTED to the extent that the Court rules that the City is entitled to summary judgment as to the *Monell* liability count against it.  The Motion is DENIED in all other respects.

       IT IS SO ORDERED.

                                     s/Sean F. Cox                                    
                                     Sean F. Cox
                                     United States District Judge

Dated:  December 2, 2020